UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENERGY & ENVIRONMENT LEGAL INSTITUTE ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> ) <br> UNITED STATES ENVIRONMENTAL ) <br> PROTECTION AGENCY, ) <br> ) <br>     Defendant. ) | <br><br><br><br><br><br>cv: 16-915 |

**VERIFIED COMPLAINT FOR DELCARATORY AND INJUNCTIVE RELIEF**

Plaintiff ENERGY & ENVIRONMENT LEGAL INSTITUTE ("E&E Legal") on behalf of its members The WESTERN STATES TRUCKING ASSOCIATION ("WSTA") and DR. JAMES E. ENSTROM for its complaint against Defendant ENVIRONMENTAL PROTECTION AGENCY ("EPA" or "the Agency"), alleges as follows:

1) This is an action under the Administrative Procedures Act, 5 U.S.C. § 704, for violation by the EPA of its obligations under the Clean Air Act, 42 U.S.C. § 7409(d)(2), and the Federal Advisory Committee Act ("FACA"), 5 U.S.C., Appendix 2.

2) This action arises out of the appointment by EPA of members of the Clean Air Scientific Advisory Committee Particulate Matter Review Panel (CASAC PM Panel) on November 17, 2015. EPA violated its obligation to appoint an "independent scientific review committee" pursuant to the Clean Air Act, 42 U.S.C. § 7409(d)(2)(A).

3) The committee that was created intends to begin holding meetings on May 23, 2016, despite failing to be independent of the agency.

4) Pursuant to the Clean Air Act, 42 U.S.C. § 7409(d)(2)(B) & (C), the EPA is obligated to appoint an independent committee to provide advice and recommendations to the administrator of the EPA every five years.

5) The appointment of this Congressionally mandated committee represents a final agency action within the meaning of the Administrative Procedures Act, 5 U.S.C. § 700 *et, seq*. There is no other adequate remedy available other than review pursuant to this statute.

6) Plaintiff asks this Court to find that the appointment of the CASAC PM Panel as composed violates the Clean Air Act, 42 U.S.C. § 7409(d)(2), and the Federal Advisory Committee Act ("FACA"), 5 U.S.C., Appendix 2, and to further enjoin the EPA from holding the scheduled May 23, 2016 meeting of the CASAC PM Panel with its current composition.

## PARTIES

7) Plaintiff Energy and Environmental Legal Institute (EELI) is a 501(c)(3) organization dedicated to the advancement of rational, free-market solutions to America's land, energy and environmental challenges. It has members throughout the nation. EELI was formed to find and challenge at law government al actions that violate core principles of good science, honest government and the rights of citizens and man. EELI is located in Washington, DC.

8) The Western States Trucking Association (WSTA) is a member of the Energy and Environment Legal Institute. Established in 1941, the WSTA, formerly known as the California Construction Trucking Association (CCTA), is a business association that advocates on behalf of owner-operators, micro-carriers, and small-business truckers. WSTA represents nearly 1,000 construction and freight industry related trucking companies ranging in size from 1 truck to over 350 trucks whose business constitutes over 75% of the hauling of dirt, rock, sand, and gravel operations in California. WSTA's member employers provide

work for approximately 6,000 drivers, mechanics, support personnel and managers. Approximately 60% of WSTA's members are sole proprietors – small one-truck independent owner-operators. While the members are predominately dump truck and construction truck operators, WSTA also represent a large segment of the construction industry that hauls oversized and overweight off-road vehicles and materials, plus a specialized segment that operates pneumatic bulk trucks, water trucks and flatbed construction trucks within this state. All operators of such trucks are motor carriers, and the vast majority of members are motor carriers. WSTA members are adversely impacted by EPA regulations for particulate matter because the engines that power their equipment and vehicles unavoidably emit particulate matter, and only an independent CASAC PM Panel can ensure the science associated with PM is fairly examined, thus allowing a properly grounded PM regulatory regime.

9) Dr. James E. Enstrom is a member of the Energy and Environment Legal Institute. Dr. Enstrom was a Research Professor specializing in epidemiology at the University of California, Los Angeles (UCLA) School of Public Health from July 1976 until June 2012. He currently retains a similar affiliation with UCLA, though retired. He has been a founding Fellow of the American College of Epidemiology since 1981, he has been listed in Who's Who in America since 1990, and he has been President of the Scientific Integrity Institute since 2005. Dr. Enstrom is the author of peer-reviewed epidemiologic research and critical analysis that questions the basis for EPA's particulate matter regulations.

10) Defendant United State Environmental Protection Agency is the federal agency responsible for establishing the CASAC PM Panel under the auspices of the Clean Air Act, 42 U.S.C. § 7409.

## JURISDICTION and VENUE

11) Jurisdiction arises from the Administrative Procedures Act, 5 U.S.C. § 703, and 28 U.S.C. §1331. This Court may enjoin agency action pending review of this matter pursuant to 5 U.S.C. § 705.

12) Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391(e) because EPA is an agency of the United States headquartered in Washington, DC.

## FACTUAL BACKGROUND

13) The Clean Air Act ("CAA") requires that EPA carry out a periodic review and revision, as appropriate, of the air quality criteria and the National Ambient Air Quality Standards (NAAQS) for the six ''criteria'' air pollutants, including particulate matter (PM). 5 U.S.C., App. Section 109(d)(1), as amended.

14) As part of an upcoming review and revision of the PM NAAQS, the EPA solicited nominations for experts to the CASAC Particulate Matter Review Panel for 2015-2018 ("CASAC PM panel").[1]

15) Based on this solicitation and information from EPA's web site, EPA received approximately 49 nominations for the CASAC PM panel.[2]

16) Dr. Enstrom was not nominated for the CASAC PM panel. His work has challenged the stance of the agency with regard to the danger of ambient airborne substances, including PM2.5. As a result he has been discouraged from applying for a position, including through professional disparagement from the former CASAC panel chairman Jonathan Samet.

---

[1] 80 FR 6086-7 (February 4, 2015).
[2] *See,*
https://yosemite.epa.gov/sab/SABPRODUCT.NSF/81e39f4c09954fcb85256ead006be86e/EB862B233FBD0CDE85257DDA004FCB8C/$File/Public%20Comment%20CASAC%20PM%20-%20List%20of%20Candidates.pdf.

17) On November 17, 2015, EPA announced the names of 26 nominees that would constitute the CASAC PM Panel. The members of the CASAC PM Panel are: Ana Diez Roux (Chairman), Peter Adams, John Adgate, George A. Allen, John R. Balmes, Kevin Boyle, Judith Chow, Douglas Dockery, Henry (Dirk) Felton, Mark Frampton, Christopher H. Frey, Terry Gordon, Jack Harkema, Joel Kaufman, Patrick Kinney, Michael T. Kleinman, Rob McConnell, David Peden, Richard L. Poirot, Stephen Polasky, Jeremy Sarnat, James Jay Schauer, Elizabeth A. (Lianne) Sheppard, Barbara Turpin, Sverre Vedal, and Ronald Wyzga.[3]

18) According to EPA's Research Grants data base, Of the 26 aforementioned members of the CASAC PM Panel, 22 of the members have been or are "principal investigators" received research grants from the EPA. These 22 CASAC PM Panel members and the amount of research grants received from EPA are as follows: Ana Diez Roux (Chairman, $33,575,181), Peter Adams ($4,230,423), John Adgate ($3,042,219, George A. Allen ($3,907,111), John R. Balmes ($5,857,626), Kevin Boyle ($321,178), Judith Chow ($449,456), Douglas Dockery ($16,046,649), Mark Frampton ($17,447,566), Christopher H. Frey ($3,136,162), Terry Gordon ($11,401,166), Jack Harkema ($26,918,114), Joel Kaufman ($44,424,256), Patrick Kinney ($40,054,030), Michael T. Kleinman ($18,250,432), Rob McConnell ($19,561,006), Stephen Polasky ($2,441,066), Jeremy Sarnat ($21,268,475), James Jay Schauer ($17,198,482), Elizabeth A. (Lianne) Sheppard ($51,524,256), Barbara Turpin ($1,444,533), and Sverre Vedal ($8,000,000).

19) Though not listed as a "principal investigator" in EPA's Research Grants data base, the biographical description of CASAC PM Panel member David Peden states that, "He is the

---

[3] *See*,
https://yosemite.epa.gov/sab/SABPRODUCT.NSF/81e39f4c09954fcb85256ead006be86e/EB862B233FBD0CDE85257DDA004FCB8C/$File/Determination%20memo-CASAC%20PM.pdf.

[principal investigator] or Project Leader of EPA, NIH and NSF grants totaling $2.5 million in direct costs focused on the effect of controlled exposures of pollutants to normal and susceptible populations, epidemiological studies of air pollutant effects on human health, genetic factors which influence adverse health outcomes and exploration of interventions to mitigate the effect of pollutants in exposed persons."[4]

20) Though not listed as a "principal investigator" in EPA's Research Grants data base, the biographical description of CASAC PM Panel member James Jay Schauer states, "Dr. Schauer's research has been supported by grants from both government agencies and private companies, with core grant research support primarily being from the federal government (U.S. Environmental Protection Agency, National Science Foundation, U.S. Department of Energy, National Oceanic and Atmospheric Administration), private industry consortia (Electric Power Research Institute, Water Environmental Research Foundation), and state and regional air quality management authorities, with additional grant support from state and local governments, industry, and foundations."

21) CASAC PM Panel chairman Ana Diez Roux has been a "principal investigator" on EPA-funded research that cost $33 million and produced over 100 papers on the health effects of PM.[5]

22) Douglas Dockery, whose study EPA considers to be "seminal" in its understanding of the alleged mortality effects of PM2.5, has been a "principal investigator" on EPA-funded research worth over $16 million.[6]

---

[4] *See,* https://yosemite.epa.gov/sab/SABPRODUCT.NSF/81e39f4c09954fcb85256ead006be86e/EB862B233FBD0CDE85257DDA004FCB8C/$File/Public%20Comment%20CASAC%20PM%20-%20List%20of%20Candidates.pdf

[5] See U.S. EPA, Research Grants Data Base, https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/search.welcome.

[6] See U.S. EPA, Research Grants Data Base, https://cfpub.epa.gov/ncer_abstracts/index.cfm/fuseaction/search.welcome.

23) According to EPA's Research Grants data base and other EPA documents, as a group these 24 of the 26 CASAC Panel PM have been employed, in the past or currently, as "principal investigators" on more than eighty-four (84) EPA extramural research grants worth more than $192,248,751. The 22 investigators listed in the EPA Research Grants data base have been employed under, and have overseen EPA grants worth on average about $8.74 million per CASAC PM Panel member.

24) The aforementioned 84 grants have produced thousands of published studies which purport to support the EPA's view of the health effects of PM. These grants have produced no published studies that we are aware of that challenge the EPA's views on the alleged health effects of PM.

25) The Texas Commission on Environmental Quality has commented to EPA about CASAC as follows:[7] "A review of the membership of the Clean Air Science Advisory Committee (CASAC) "…indicates that most members are affiliated with academic institutions and receive EPA funding. This information raises significant concerns regarding conflict of interest within the CASAC as well as undermining the goal of independent peer review of EPA rulemakings and associated analyses." Further that "Members of the Science Advisory Board and CASAC should not include the authors of studies utilized in that specific assessment, nor should they be current recipients of EPA funding, as this represents a significant conflict of interest…. If such individuals are to be consulted, equal weight should be given to scientists representing a wide variety of backgrounds and points of view, e.g. local or state governments."

26) EPA describes PM2.5, also known as "fine particulate matter" as follows: "Particulate matter," also known as particle pollution or PM, is a complex mixture of extremely small

---

[7] *See* https://science.house.gov/news/press-releases/icymi-tceq-criticism-epa-air-pollution-science.

particles and liquid droplets.  Particle pollution is made up of a number of components, including acids (such as nitrates and sulfates), organic chemicals, metals, and soil or dust particles. The size of particles is directly linked to their potential for causing health problems. EPA is concerned about particles that are 10 micrometers in diameter or smaller because those are the particles that generally pass through the throat and nose and enter the lungs. Once inhaled, these particles may have the potential to affect the heart and lungs and cause serious health effects.[8]

27) EPA groups particle pollution into two categories: "Inhalable coarse particles," such as those found near roadways and dusty industries, which are larger than 2.5 micrometers and smaller than 10 micrometers in diameter. "Fine particles," such as those found in smoke and haze, which are 2.5 micrometers in diameter and smaller. These particles can be directly emitted from sources such as forest fires, or they can form when gases emitted from power plants, industries and automobiles react in the air.[9]

28) Epidemiologist and toxicologist Julie E. Goodman, Ph.D., DABT testified to the United States House of Representatives Committee on Energy and Commerce Subcommittee on Energy and Power that [10] "EPA estimated that the Mercury and Air Toxics Standards will reduce the disease burden in America to such an extent that it will translate to tens of billions of dollars saved. The largest benefits from the Mercury and Air Toxics Standards are derived not from reducing mercury, but from reducing fine particulate matter (PM2.5). Despite the vast array of peer-reviewed scientific literature on the topic, EPA based its

---

[8] USEPA "Particulate Matter (PM)," *see*, http://epa.gov/airquality/particlepollution/ (*accessed*, 9/12/2012).
[9] USEPA "Particulate Matter (PM)," *see*, http://epa.gov/airquality/particlepollution/ (*accessed*, 9/12/2012).
[10] *See,* https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/Hearings/EP/20120208/HHRG-112-IF03-WState-JGoodman-20120208.pdf.

calculations on only two PM2.5 epidemiology studies that reported statistical associations between PM2.5 reductions and health benefits and assumed a causal relationship. These studies had methodological limitations and were not consistent with many epidemiology studies indicating no correlation between reducing PM2.5 and health benefits or experimental studies indicating an exposure threshold below which PM2.5 is not likely to overwhelm the body's natural defenses. Thus, EPA's analysis led to grossly inflated estimates of benefits."

29) In their study "Has reducing fine particulate matter and ozone caused reduced mortality rates in the United States?," Anthony Cox, Ph.D. and Douglas A. Popken, PhD. reported "These findings suggest that predicted substantial human longevity benefits resulting from reducing PM2.5 and O3 may not occur or may be smaller than previously estimated. Our results highlight the potential for heterogeneity in air pollution health effects across regions, and the high potential value of accountability research comparing model-based predictions of health benefits from reducing air pollutants to historical records of what actually occurred." [11] [Emphasis added]

## LEGAL ARGUMENTS

**Defendant EPA has Failed to Appoint a Proper Advisory Committee as Required by Law**

30) The Administrator is required is appoint an **independent** scientific review committee pursuant to the Clean Air Act, 42 U.S.C. § 7409(d)(2)(A) (emphasis added)

31) The Federal Advisory Committee Act ("FACA"), 5 U.S.C., §5 (3) states that in creating and defining the responsibility of an advisory committee, Congress shall ensure the committee

---

[11] *Ann Epidemiol.* 2015 Mar;25(3):162-73. doi: 10.1016/j.annepidem.2014.11.006. Epub 2014 Nov 20.

"will not be inappropriately influenced by the appointing authority or by any special interest."

32) The Federal Advisory Committee Act ("FACA"), 5 U.S.C., §5 (2) further states that in established statutory advisory committees Congress shall "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented."

33) In the Clean Air Act, Congress established these mandates through the requirement that the Administrator appoint a scientific review committee which was independent, and thus that the members of the committee not be tied to or reliant on the agency.

34) However the agency instead chose to appoint to the committee personnel who had substantial ties to it, through the acceptance of EPA-funded grants, and by working on EPA-commissioned research.

35) The vast majority of appointees cannot undertake an independent analysis of the data because they are authors of some of the data and are naturally going to place greater importance on their own work or work that is consonant with their own work.

36) In consequence EPA has crafted a committee precisely designed to be inappropriately influenced by the appointing agency own view, or their own self-serving views, rather than as a scientifically "disinterested" point of view that is required of an "independent" scientific body.

37) Those within EPA have articulated the view that PM2.5 ought to be more stringently regulated.

38) Having appointed a committee designed to regurgitate the agency's own view, EPA has ensured that it will receive recommendations that ambient air quality standards should be made more stringent, despite considerable scientific evidence that this is unnecessary.

39) More stringent ambient air quality standards with regard to PM2.5 will negatively affect the economic interests of Plaintiff's members.

40) Other members of Plaintiff, including Dr. Enstrom, have suffered a loss of professional opportunity due to the known bias of agency for selecting members of this advisory committee that support the agency's own position, and thus have been turned away from becoming part of the process.

41) The EPA is Congressionally required to constitute the CASAC PM Panel advisory committee, at this time, and to receive the committee's review of the existing ambient air quality standards.

42) If EPA constitutes an improper committee it will receive a fatally flawed review, and be unable to fulfill it mandated obligation under the Clean Air Act, 42 U.S.C. § 7409(d)(2).

43) The inaugural meeting of the committee as currently constituted is set for May 23, 2016. If the committee begins meeting and undertaking work, that work cannot meet the legally required independence from the agency and or contained a balanced point of view on the subject upon which they are to offer advice and guidance.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### Declaratory Judgment

44) Plaintiff re-alleges paragraphs 1-43 as if fully set out herein.

45) Plaintiff's members will suffer harm from the EPA appointment of an improperly constituted CASAC PM Panel advisory committee.

46) The appointment of this advisory committee is a final agency action within the meaning of the Administrative Procedures Act, 5 U.S.C. § 704, subject to judicial review, and for which there is no other adequate remedy in Court.

47) Plaintiff asks this Court to enter a judgment declaring:

   i. The appointment of the CASAC PM Panel advisory committee as it is currently constituted violates the requirements of the Clean Air Act, 42 U.S.C. § 7409(d)(2)(a).

   ii. Further the committee as currently constituted violates the requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C., Appendix 2.

   iii. The EPA is required to establish a proper advisory committee pursuant to the Clean Air Act, 42 U.S.C. § 7409(d)(2)(b), and must establish an advisory committee as required made up of members independent from the agency as mandated by the Clean Air Act and containing a balanced point of view, as required under the Federal Advisory Committee Act.

## SECOND CLAIM FOR RELIEF
## INJUNCTIVE RELIEF

45) Plaintiff re-alleges paragraphs 1-44 as if fully set out herein.

46) Plaintiff is entitled to injunctive relief compelling EPA to establish a properly constituted scientific advisory committee as required under the Clean Air Act.

47) Plaintiff asks this Court to order EPA to review all candidates nominated for the CASAC PM Panel, to readvertise for members if the current nominees do not contain sufficient numbers of independent potential members, and to constitute a new panel, containing nominated members who are independent from the agency.

48) Plaintiff asks the Court to order EPA to consult with Plaintiff regarding the make-up of the newly constituted CASAC PM Panel, and to require EPA to file a status report demonstrating the newly constituted committee's members are independent from the agency

and whether the committee is fairly balanced with regard to point of view on the scientific topics being examined by the committee.

### THIRD CLAIM FOR RELIEF
### INJUNCTIVE RELIEF

49) Plaintiff re-alleges paragraphs 1-48 as if fully set out herein.

50) Plaintiff asks the Court to issue a stay ordering that the CASAC PM Panel may not convene to meet or hold session until it has been properly constituted, in accordance with the requirements of the Clean Air Act and the Federal Advisory Committee Act.

Respectfully submitted this 13th day of May, 2016,

                                            /s/
                                      Chaim Mandelbaum
                                      D.D.C.  Bar No. VA86199
                                      726 N. Nelson St, Suite 9
                                      Arlington, VA 22203
                                      (703) 577-9973
                                      Chaim12@gmail.com

                                            /s/
                                      Steve Milloy
                                      D.D.C.  Bar No. 418167
                                      12309 Briarbush Lane
                                      Potomac, MD 20854
                                      301-258-9320
                                      milloy@me.com

                                      ATTORNEYS FOR PLAINTIFF